UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
―――

DANIEL CLARE RADEMACHER,

     Petitioner,     Case No. 1:08-cv-871

v.             Honorable Janet T. Neff

MARY BERGHUIS,

     Respondent.
_____/

## REPORT AND RECOMMENDATION

    This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254.  Petitioner is serving concurrent terms of 15 to 30 years, imposed by the Gratiot County

Circuit Court on September 14, 2004, after a jury convicted Petitioner of two counts of first-degree

criminal sexual conduct, MICH. COMP. LAWS § 750.520b(1)(b).  In his *pro se* petition, Petitioner

raises eleven grounds for relief, as follows:

  I.  [Petitioner] was denied his V, VI, VII, VIII, X, XIII, XIV, and XVIII
    Constitutional Amendment Rights as a result of the trial court's denial of (2)
    motions for mistrial where bailiff's clearly prejudicial comment to jurors in
    the jury room constituted extraneous prejudicial influence.

  II.  [Petitioner] was denied his V, VI, VII, VIII, X, XIII, and XIV Constitutional
    Amendment Rights when the court failed to grant [Petitioner's] request for
    discovery.

  III.  [Petitioner] was denied his V, VI, VIII, X, XIII, and XIV Constitutional
    Amendment Rights when the court failed to allow [Petitioner] to present
    previously unknown last minute discovery regarding officer's testimony.

  IV.  [Petitioner] was denied his V, VI, VII, VIII, XIII, and XIV Constitutional
    Amendment Rights when the trial court allowed the prosecutor to present
    prior bad acts evidence against the [Petitioner] without proper purpose.

V.      [Petitioner] was denied his V, VI, VII, VIII, XIII, XIV, and XVIII
        Constitutional Amendment Rights when the trial court sentenced [Petitioner]
        based upon facts not found by the jury, and acquittal findings.

VI.     [Petitioner] was denied his V, VI, VII, VIII, XIII, and XIV Constitutional
        Amendment Rights as a result of prejudice[,] bias and abuse of discretion
        displayed by the court, as a result of a single act, o[r] the culmination of
        numerous acts.

VII.    [Petitioner] was denied his V, VI, VII, XIII, and XIV Constitutional
        Amendment Rights as a result of prosecutorial misconduct and/or vindictive
        prosecution through a single act and/or a culmination of numerous acts.

VIII.   [Petitioner] was denied his V, VI, VII, VIII, XIII, XIV, and XVIII
        Constitutional Amendment Rights when the trial court denied motion for
        directed verdict and allowed perjured testimony to stand as evidence.

IX.     [Petitioner] was denied his V, VI, VII, VIII, XIII, XIV, and XVIII
        Constitutional Amendment Rights by finding of guilt based upon insufficient
        evidence to support such a finding.

X.      [Petitioner] was denied his V, VI, VII, VIII, XIII, and XIV Constitutional
        Amendment Rights [as] a result of ineffective assistance provided by the
        State's appointed appellate counsel.

XI.     [Petitioner] was denied his V, VI, VII, VIII, and XIV Constitutional
        Amendment Rights as a result of [Petitioner's] non-factual and errored [sic]
        Pre-Sentence Investigation Report.

Respondent has filed an answer to the petition (docket #9) stating that the petition should be denied

because Petitioner's claims are without merit or are procedurally defaulted.  Petitioner filed a reply

to the answer (docket #25).  Upon review and applying the AEDPA standards, I find that Petitioner's

claims are without merit. Accordingly, I recommend that the petition be denied.

**Procedural History**

**A.     Trial Court Proceedings**

Petitioner was charged with four counts of first-degree criminal sexual conduct. The complainant was Petitioner's daughter, Allison Rademacher. A bench trial was held on May 12 and 13, 2004.

Linda Lewandowski testified that she and Petitioner were the biological parents of Allison Rademacher, who was seventeen years old at the time of trial. (Trial Transcript I (Tr. I), 161-62, docket #36.) Lewandowski and Petitioner had been divorced for ten years. (Tr. I, 162.) Lewandowski had primary custody of Allison and Petitioner had visitation every other weekend and a period of summer vacation. (Tr. I, 163.) Allison had surgery on Wednesday, April 10, 2002, and went to stay with her father the following weekend. (Tr. I, 163-64.) The doctor gave Allison a prescription for Tylenol 3 or Vicodin. (Tr. I, 168-69.) Lewandowski first heard allegations that Petitioner sexually abused Allison on April 1, 2003, from Allison's boyfriend's mother, Kelly Root. When Lewandowski asked Allison about the allegations, Allison told her that Petitioner had sex with her the weekend after her surgery. (Tr. I, 170.) Lewandowski called the police the same day. (Tr. I, 166, 173.) On cross-examination, Lewandowski admitted that she did not like Petitioner and tried to block his visitation rights a number of times when they were first divorced. (Tr. I, 167.) Lewandowski denied that she wrote a letter to the Friend of the Court when Allison was eleven or twelve years old claiming that Petitioner had touched her in a sexual manner. (Tr. I, 167-68.)

Allison Rademacher testified that she was a junior at St. John's High School. (Tr. I, 185.) Allison testified that she had sexual intercourse with Petitioner on two occasions in 2002. (Tr. I, 187.) The first time was on a weekend before Easter in March 2002. (Tr. I, 188.) The

incident occurred on Saturday night or early Sunday morning in Petitioner's bedroom at his home on Rainbow Lake. (Tr. I, 189.) Allison was cold, so she decided to get into her father's heated waterbed with him. (Tr. I, 191-92.) She was wearing a tee-shirt, shorts and underwear. (Tr. I, 191.) Petitioner was wearing underwear. (Tr. I, 192.) Allison and Petitioner were back to back, but Petitioner rolled over and started touching Allison's breast over her shirt and then under her shirt. (Tr. I, 192-93.) Petitioner removed Allison's shorts and underwear, pushed her shirt up around her neck and he "stuck his penis in [her] vagina." (Tr. I, 193.) Allison was laying on her back with Petitioner was on top of her. (Tr. I, 193.) Petitioner ejaculated on her chest and she went to the bathroom to wipe it off. (Tr. I, 195.) Allison dressed and got back in Petitioner's bed. (Tr. I, 196.) The next day, Petitioner told Allison that it would be their little secret and that she should not tell anyone. (Tr. I, 196.)

Allison testified that the second time Petitioner had sex with her was not the weekend immediately after she had surgery to remove a lymph node from her neck, but the next time she had visitation with him. (Tr. I, 188-200.) On the Saturday night of her visitation with Petitioner, Allison got cold again and got in bed with Petitioner. (Tr. I, 200.) Allison was taking Vicodin following her surgery, but did not believe that the drugs affected her memory of the events. (Tr. I, 201, 255.) Petitioner was awake watching television. After Allison got in bed, Petitioner starting touching her breasts and vagina. (Tr. I, 202.) He removed her tee shirt and sucked on her nipple. (Tr. I, 203.) Petitioner also removed her shorts and underwear and put his finger and then his tongue inside her vagina. (Tr. I, 203.) Petitioner got a condom out of the night stand, put it on, got on top of Allison and put his penis in her vagina. (Tr. I, 205.) Allison could see semen when Petitioner removed the condom. (Tr. I, 205.) Allison went to the bathroom to clean up, got dressed and then got back in

- 4 -

Petitioner's bed.  (Tr. I, 205-06.)  The next time Allison went for visitation, she got into Petitioner's bed again, but when he started to touch her, she said "no" and he stopped.  (Tr. I, 207.)  Allison continued to go to her father's after that, but always took a friend with her because she was scared.  (Tr. I, 208-10.)  Allison also related five or six incidents when she and her father would give each other "titty twisters" over their clothes.  (Tr. I, 210.)  In addition, she recalled an incident in the summer of 2001 when Petitioner photographed her topless while she was holding a dildo.  (Tr. I, 211-215.)  Petitioner later showed the photo to Allison's friends, Vicki Van Ells and Lisa Halfman.  (Tr. I, 216.)

Allison testified that she did not tell anyone about the sexual episodes with Petitioner right away because she was scared and she "thought it would be just way too overwhelming to tell."  (Tr. I, 217.)  However, three or four months later, she told her ex-boyfriend, Dylan Billups.  (Tr. I, 217.)  A few months after that, she told Lisa Halfman.  (Tr. I, 218.)  Allison told Sean Root, her boyfriend at the time, on March 31, 2003.  (Tr. I, 218.)  Allison admitted to testifying at the preliminary examination that the first person she told about the sexual abuse was Lisa Halfman.  (Tr. I, 220, 246-47.)  Allison testified at trial that she lied at the preliminary examination because she did not want to get Billups involved.  (Tr. I, 221.)  When Allison gave her statement to Trooper Noble on April 1, 2003, she reported only the incident that occurred before her neck surgery.  (Tr. I, 222.)  Allison did not tell Noble about the second incident because she was scared and overwhelmed.  (Tr. I, 222.)  Allison testified that when she met with Detective Benn on April 2, she told him everything.  (Tr. I, 260.)  Benn also asked Allison to call her father and see whether she could get him to admit anything over the phone.  Benn recorded the phone conversation.  (Tr. I, 223.)

Allison testified that during the summer of 2002, she was fifteen-years-old and had a learner's permit to drive. (Tr. I, 226, 235.) While she was visiting her father that summer, Allison took one of her father's cars without his permission and got into an accident when she backed into a telephone pole. (Tr. I, 237.) Petitioner was angry and told Allison that she was grounded and could not have anyone up the next weekend. (Tr. I, 239.) However, Allison brought four girls to Petitioner's the following weekend and they had a party. (Tr. I, 240.) Then, during the winter of 2003, Allison lost control of another car owned by her father and ended up in a ditch. (Tr. I, 242-43.) Petitioner was upset, but did not punish Allison as a result of the accident other than taking away her driving privileges while she was with him. (Tr. I, 243-44.) Petitioner never told Allison that he would buy her a car or give her one of his cars. (Tr. I, 244-45.) According to Allison's trial testimony, she told Billups about the sexual abuse before she had the car accidents, but did not tell Lisa Halfman until after the accidents. (Tr. I, 246-58.) Allison denied that she changed her story about who she first told about the sexual abuse in order to undermine her father's theory was that she concocted the story because she was angry at Petitioner for punishing her for the car accidents. (Tr. I, 258.)

Michigan State Police Officer Steven Benn testified that he met with Allison on April 2. (Tr. I, 272.) He asked her to make a phone call to her father that Benn was going to record. (Tr. I, 273; Trial Transcript II (Tr. II), 330, docket #27.) Before she made the call, Benn told Allison that the recording would be used in court and coached her about how to get Petitioner to provide information about the sexual assaults. He also passed notes to her during the conversation with questions for her to ask Petitioner. (Tr. II, 300-303, 319, 330.) One of the notes instructed Allison to tell Petitioner that all she wanted was for him to say he was sorry for having sex with her. (Tr.

II, 331-32.)  The tape was played for the jury.  (Tr. I, 282.)  Allison also gave Benn a statement that included both incidents of alleged sexual penetration and the third incident where Petitioner allegedly touched Allison and she said "no."  (Tr. II, 298-99.)

Candy Peoples testified that she met Petitioner in October 2002 and they had been living together for a year-and-a-half.  (Tr. II, 349-50, 358.)  Peoples was in the car with Allison when she slid off the road in Petitioner's Cadillac in March 2003.  (Tr. II, 350, 355.)  Petitioner was upset about the accident, but did not yell at Allison.  (Tr. II, 356.)  However, he was firm in telling her that she needed to be more careful and banned her from driving while she was at his house.  (Tr. II, 351, 356-57.)  Based upon her observation, Peoples believed that Allison and Petitioner got along great as father and daughter.  (Tr. II, 351-52.)

The trial court instructed the jury on four counts of CSC I.  Counts I and II charged vaginal intercourse, Count II charged penetration in the form of cunnilingus and Count IV charged digital penetration.  (Tr. II, 438-39.)  At the conclusion of trial, on May 13, 2004, the jury found Petitioner guilty of Counts I and II and not guilty of Counts III and IV.  (Tr. II, 452-53.)  On September 14, 2004, Petitioner was sentenced to serve concurrent prison terms of 15 to 30 years. (Sentencing Transcript (S. Tr.), 50, docket #40.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on April 26, 2005, raised five claims of error.  (*See* Def.-Appellant's Br. on Appeal, docket #20.)  By unpublished opinion issued on March 21, 2006, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 3/21/06 Mich. Ct. App. Opinion (MCOA Op.), docket #20.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same five claims presented before and rejected by the Michigan Court of Appeals.  By order entered October 31, 2006, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., docket #22.)

## C.      Post-conviction relief

On April 5, 2007, Petitioner filed a motion for relief from judgment in the Gratiot County Circuit Court raising six new claims of error.  On May 9, 2007, the circuit court denied his motion on the merits. The Michigan Court of Appeals denied Petitioner's application for leave to appeal for lack of merit in the grounds presented on February 20, 2008.  (*See* Mich. Ct. App. Ord., docket #21.)  The Michigan Supreme Court subsequently denied Petitioner's application for leave to appeal on July 29, 2008, for failure to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D) (*See* Mich. Ord., docket #23).

## Standard of Review

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an

unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Id.* at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  "Yet, while the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be  instructive in assessing the reasonableness of a state court's resolution of an issue."  *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).  A federal habeas court may not find a state adjudication to be "unreasonable"

"simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.

<u>Discussion</u>

**Ground 1:  Denial of Right to Impartial Jury Due to Extraneous Prejudicial Influence**

In his first ground for habeas corpus relief, Petitioner contends that his constitutional right to an impartial jury was violated when a bailiff went into the jury room and made a prejudicial comment regarding the defense.  The bailiff allegedly told the jurors something to the effect, "that there weren't going to be any more witnesses called and that the defense had intended to call a witness but the Judge had ruled that that couldn't occur, outside [the jury's] presence.  And that the Court had made that decision because of the rules of evidence or limitations on cross-examination." (Hearing re Post Verdict Voir Dire of the Jury (PV Hearing Tr.), 9, docket #39.)  The bailiff's comment went unknown to the court, prosecutor and defense until approximately one month after the trial.  While dining at a restaurant, one of the jurors on Petitioner's case approached a Gratiot County judge, not the judge who presided over Petitioner's case, and expressed his/her concern about the bailiff's comment.  The information was quickly relayed by the non-presiding judge to the prosecutor, who notified defense counsel and initiated an investigation.  Petitioner filed a motion for new trial based upon the bailiff's extraneous influence on the jury.

On August 31, 2004, the trial court convened a  hearing for post verdict voir dire of the jury.  All of the jurors were present at the hearing with the exception of Juror Taylor, who testified via telephone.  (PV Hearing Tr., 5.)  Jurors Rockafellow, Hoffer, Kolodziejski, Bates and

- 10 -

Taylor had no recollection whatsoever of the bailiff making any comment about defense witnesses, nor were they aware of any discussion by the jury on the subject. (PV Hearing Tr., 9, 24, 27, 31, 24, 91.) Juror Abel testified that the jurors were surprised that more witnesses were not called based upon the witness list read by the court during voir dire, but she did not hear any statement by the bailiff concerning witnesses. (PV Hearing Tr., 13-14.) The only thing Juror Deitz recalled was the bailiff saying that no more witnesses were being called. (PV Hearing Tr., 71-73.) Juror Needham only remembered the bailiff saying something about a witness not showing up. (PV Hearing Tr., 50-53.) Needham did not give the comment any further thought and it did not affect his decision in the case. (PV Hearing Tr., 51.)

The remaining three witnesses testified that they heard the bailiff make a comment regarding the fact that the defense was not going to call any further witnesses. Juror Wright testified that in response to a question from a juror about why they were not going to hear another witness, the bailiff responded that "the defense attorney wanted to call up a witness but the Prosecutor would not have a chance to cross-examine him" so the trial court ruled that the witness could not testify. (PV Hearing Tr., 18.) The statement was made after lunch on the second day of trial when all of the jurors were in the jury room and the bailiff was standing in the doorway. (PV Hearing Tr., 18-19.) Wright was at the end of the table near the door, but did not know if other jurors heard because other people were talking. (PV Hearing Tr., 19.) According to Wright, the jurors wondered why they did not hear more witnesses, but their quandary did not relate to the bailiff's comment and he did not think it helped one side or the other. (PV Hearing Tr., 19-21.)

Juror Scates also recalled the bailiff making a statement after the jury returned from lunch, "that they weren't going to call any more witnesses, that it may do more harm than good, and

- 11 -

that they decided to go into deliberations and that that would take about an hour, and that at that time we would go reconvene in the court." (PV Hearing Tr., 38-39, 41.) Scates assumed that the bailiff was referring to the defense because the prosecutor already had rested. (PV Hearing Tr., 40.) Scates was near the door where the bailiff was standing, but he was not sure if all of the jurors could hear. (PV Hearing Tr., 39.) Scates believed that the comment was volunteered by the bailiff. (PV Hearing Tr., 39.) Scates testified that there was no discussion of the bailiff's comment and it did not affect his decision. (PV Hearing Tr., 42-44.)

Juror Giles recalled the bailiff making a comment after lunch on the second day of trial while they were in the jury room. (PV Hearing Tr., 56-57.) The jurors were expecting to hear additional defense witnesses after lunch. (PV Hearing Tr., 59-60.) Giles was seated in the fourth chair from the door where the bailiff was standing. (PV Hearing Tr., 56.) According to Giles, the bailiff came to the door and told the jury that they were not going to hear any more witnesses and they would not be returning to the courtroom for some period of time. (PV Hearing Tr., 58-60.) One of the jurors responded that they expected to hear additional witnesses and the bailiff said something like, "do you really think that's going to help?" (PV Hearing Tr., 58.) Giles considered the comment to be derogatory and unprofessional, but laughed it off as a joke. (PV Hearing Tr., 58, 61-63.) Giles testified that the bailiff's comment was not discussed by the jury and did not affect his decision in the case. (PV Hearing Tr., 61-63.)

Chris Olsen testified that he was employed by the Gratiot County Sheriff's Department as a bailiff in the circuit court. (PV Hearing Tr., 76-77.) He previously was employed by the Michigan State Police for twenty-seven years. (PV Hearing Tr., 77.) Olsen was in charge of the jury on the second day of trial after the lunch break. (PV Hearing Tr., 78.) On his own

initiative, Olsen went to the jury room and explained that the court had chosen to dismiss the rest of the defense witnesses and they should get ready to go back when the court called them.  (PV Hearing Tr., 79-81.)  Olsen did not recall saying anything else to the jury, but he could have.  (PV Hearing Tr., 84.)

Following a hearing on September 14, 2004, the trial court held that based upon the post-verdict voir dire, he believed that the bailiff made in an improper comment, but the comment did not affect the jury's deliberations or verdict.  (Hearing on Motion for New Trial  (NT Hearing Tr.), 10-11, docket #40.)  Consequently, the court denied Petitioner's motion for a new trial.  (NT Hearing Tr., 11.)   The Michigan Court of Appeals upheld the trial court's determination, stating:

> Defendant next argues that the court erred in denying defendant's motion for a new trial where the bailiff made inappropriate comments to the jury. We review a trial court's denial of a new trial for an abuse of discretion. *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003).
>
> The court held a hearing regarding the incident in question. The bailiff testified that he knocked on the jury door and all of the jurors were present. He stated that one of the jurors asked what was going on and he explained to the jurors that the court dismissed the rest of the defense witnesses and that the jury should get ready to go back into the courtroom.
>
> The court questioned the jurors individually. Seven of the jurors stated that they did not hear the bailiff make the comment in question and that their individual decisions regarding the verdict were not affected by the bailiff's comment. Five of the jurors said they heard the bailiff make a comment regarding whether they would hear additional witnesses, but they all stated that his comment did not affect their verdict. One of the jurors said he remembered the bailiff commenting that the defense was not going to call any more witnesses and that to do so would cause more harm than good. The juror explained that the bailiff's comment was not a topic of discussion and that the comment did not affect his individual decision regarding the verdict. Another juror said he heard the bailiff say, in response to a juror's question regarding whether or not the jury was going to hear more witnesses, something to the effect of, 'do you really think it is going to help?' The juror classified the bailiff's comment as derogatory, but explained that it was not a topic of conversation among the jurors and did not affect his individual decision regarding the verdict.

The right to a fair and impartial jury is a bedrock of our judicial system. See *People v Tyburski*, 445 Mich 606, 618; 518 NW2d 441 (1994). As the Michigan Supreme Court noted in *People v Budzyn*, 456 Mich 77, 88; 566 NW2d 229 (1997):

> During their deliberations, jurors may only consider the evidence that is presented to them in open court. See *United States v Navarro-Garcia*, 926 F2d 818, 820 (CA 9, 1991). Where the jury considers extraneous facts not introduced in evidence, this deprives a defendant of his rights of confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment. See *Hughes v Borg*, 898 F2d 695, 700 (CA 9, 1990).

In *Budzyn, supra*, the Michigan Supreme Court set forth the test for determining whether extrinsic influence was error requiring reversal. The Court stated:

> First, the defendant must prove that the jury was exposed to extraneous influences. Second, the defendant must establish that these extraneous influences created a real and substantial possibility that they could have affected the jury's verdict. Generally, in proving this second point, the defendant will demonstrate that the extraneous influence is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict. If the defendant establishes this initial burden, the burden shifts to the people to demonstrate that the error was harmless beyond a reasonable doubt. [*Budzyn, supra* at 88-89 (internal citations omitted).]

The court, when considering the factors in determining whether the extrinsic influence created a real and substantial possibility of prejudice, may consider:

> (1) whether the material was actually received, and if so how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict. [*Id.* at 89 n 11, citing *Marino v Vasquez*, 812 F2d 499, 506 (CA 9, 1987).]

In the present case, neither defendant nor plaintiff contests whether the improper comment was made. Therefore, the only issue on appeal is whether the bailiff's comment could have affected the jury's verdict. *Budzyn, supra* at 88-89. Based on the jurors' statements, the comment occurred before the jury was instructed

or began its deliberations. It does not appear that the jurors discussed the bailiff's comment or that it was a factor during their deliberations. Although improper, it appears to be a fleeting comment not heard by a majority of the jurors. Those who heard the comment either only remember the bailiff commenting on the number of witnesses or thought the comment was unprofessional. Regardless of the extent of the communication, all of the jurors agreed that the bailiff's comment did not influence their individual decision as to whether or not defendant was guilty. Accordingly, this Court finds that, although improper, the bailiff's comment did not affect the verdict and therefore there was no prejudice to defendant.

(MCOA Op., 3-5) (footnote omitted.)

The Sixth Amendment, which is applicable to the state through the Fourteenth Amendment, provides that a criminal defendant is entitled to a fair trial by a panel of impartial jurors. *See Irvin v. Dowd*, 366 U.S. 717 (1960). Notwithstanding a defendant's right to an impartial jury, it is a well established rule of common law that a jury verdict may not be impeached by the testimony of one or more jurors. *See Tanner v. United States*, 483 U.S. 107, 117 (1987); *Mattox v. United States*, 146 U.S. 140, 149 (1892). The rule is supported by the important policy consideration of protecting jury deliberations from public scrutiny. *Tanner*, 483 U.S. at 119-20. Exceptions to the common law rule have been recognized in narrow circumstances where the jury has been exposed to an extraneous or "external" influence. *Id.* A trial court is required to investigate the issue of jury taint when there is a credible allegation of extraneous influence to ensure that the defendant's constitutional rights have not been violated. *United States v. Corrado*, 227 F.3d 528, 536 (6th Cir. 2000) (citing cases). A state court's factual findings concerning jury impartiality are presumed correct and may not be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Delisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998) ("[W]e may only overturn a state court's findings of juror impartiality if those findings were manifestly erroneous.").

Examples of Supreme Court cases applying the common law exception for extraneous influences include *Mattox*, in which the Supreme Court held admissible the testimony of jurors that during deliberations one of the bailiffs in charge of the jury told them that the defendant had murdered other victims before, and testimony that the jurors had read a newspaper article during deliberations characterizing the evidence against the defendant as exceptionally strong. *See Mattox*, 146 U.S. at 142-43, 149.  The *Mattox* Court stated that "a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind."  *Id.* at 149.

Similarly, in *Parker v. Gladden*, 385 U.S. 363 (1966) (per curiam), the Supreme Court considered testimony that some of the jurors overheard a bailiff's comments that the defendant was a wicked, guilty man and that if there was anything wrong with convicting the defendant, the Supreme Court would correct it.  Although the Court did not directly address the admissibility of the juror testimony, it noted that the bailiff's "expressions were private talk, tending to reach the jury by outside influence."  *Id.* at 364 (internal quotation marks omitted).  The Supreme Court held that the case was controlled by the Sixth Amendment, which guarantees an accused the right to trial by an impartial jury and to be confronted by the witnesses against him.  *Id.*  The Court noted that the statements made by the bailiff were not subjected to confrontation or cross-examination, which "are among the fundamental requirements of a constitutionally fair trial."  *Id.* at 364-65.  The Supreme Court further concluded that the bailiff's comments "involve[d] such a probability that prejudice will result that it is deemed inherently lacking in due process."  *Id.* at 365 (internal citations omitted).

In this case, the trial court held a hearing and conducted voir dire of each juror and also heard testimony from the bailiff who made the comment.  After hearing all of the testimony,

- 16 -

the trial court concluded that while the bailiff made in an improper comment, the comment did not affect the jury's deliberations or verdict. (New Trial Hearing Tr., 10-11, docket #40.) Petitioner has failed to offer any evidence that would overcome the state court's factual findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Delisle*, 161 F.3d at 382. Moreover, the bailiff's comment at issue in this case is easily distinguishable from *Mattox* and *Parker*. First, seven of the jurors had no recollection whatsoever of the bailiff making a comment. Two jurors only heard the bailiff make a comment that no more witnesses would be called or that a witness did not show up and did not give it any further thought. While the remaining three jurors recalled hearing the bailiff make a more detailed comment about why the defense was not calling any further witnesses, those jurors testified that there was no discussion among the jurors about the comment and it did not affect their decision in the case. While two of the jurors heard the bailiff make comments that could be construed as derogatory to the defense, the comments did not directly attack Petitioner's character and were not as inherently prejudicial as the comments at issue in *Mattox* and *Parker*. Accordingly, the decision of the Michigan Court of Appeals was not an unreasonable application of clearly established Supreme Court precedent.

### Grounds II & III: Trial Court's Denial of Petitioner's Requests for Discovery

In Ground II, Petitioner contends that his constitutional rights were violated when the trial court denied his motion for discovery. He further claims that the prosecutor failed to produce exculpatory evidence that, if produced, would have affected the outcome of the trial. Petitioner's claim focuses on the following three requests, which will be discussed below in greater detail: (1) police records, notes, recordings, statements, evidence and reports related to the case; (2) records, notes or reports by a doctor, social worker, psychologist or other care provider who

examined or interviewed the complaining witness that would be used by the state; and (3) any records, notes or reports regarding previous incidents or allegations of assault by the accused against Petitioner or any other person.  In Ground III, which overlaps with Ground II, Petitioner contends that the trial court violated his constitutional rights when it failed to allow Petitioner to present previously unknown last minute discovery regarding Officer Benn's testimony.

With regard to Petitioner's request for police notes, the prosecutor maintained that the notes did not contain exculpatory information and were not discoverable because they were not part of a formal police report.  (Plaintiff's Response to Defendant's Mot. for Discovery, 1, docket #13.)  Following a hearing on November 3, 2003, the trial court ruled that the police notes should be submitted to the Court for in camera review.  (Discovery Hearing I Transcript (DH Tr. I), 21, docket #34.)  After reviewing the notes, the trial court ruled that nothing in the notes would be of assistance to the defense for purposes of refuting the charges, establishing a defense, or impeaching the credibility of witnesses.  (Discovery Hearing II Transcript (DH Tr. II), 5, docket #35.)

At trial, Michigan State Police Officer Steven Benn testified that he passed notes to the victim during a recorded phone call that she made to Petitioner.  (Tr. II, 300-303, 319, 330.)  One of the notes instructed the victim to tell Petitioner that all she wanted was for him to say he was sorry for having sex with her.  (Tr. II, 331-32.)  Benn testified that he filled a page-and-a-half to two pages of note paper with questions during the conversation and had turned over those pages to the prosecutor.  (Tr. II, 301.)  After defense counsel requested a break, the trial court indicated that Benn's notes from the phone conversation were among the officer notes that the court had reviewed in camera.  The court ordered that a copy of the notes be provided to the defense.  (Tr. II, 308-09.)  Defense counsel renewed his  motion to have all of the officer notes turned over to the defense, to

admit as evidence Benn's notes from the phone conversation and to dismiss the case based upon the prosecutor's failure to produce exculpatory evidence. (Tr. II, 311-312.) The court granted defense counsel's motion for admission of the notes, but denied his remaining motions. (Tr. II, 314-15.) The court was satisfied that the remaining notes, which were reviewed in camera, were not subject to discovery and would not benefit the defense. (Tr. II, 314.) The court also denied Petitioner's motion to dismiss because it did not believe that Benn's notes from the phone conversation were exculpatory. (Tr. II, 314-15.) The trial court's denial of these two motions is the basis for Ground III.

With regard to the request for records, notes or reports kept by a doctor, social worker, psychologist or other care provider, the prosecutor responded that it did not intend to introduce any such records at trial. The prosecutor did not expect medical examination results to have any evidentiary value in light of the long delay between the sexual misconduct and the time that it was reported. (DH Tr. I, 15.) In addition, the prosecutor maintained that the requested materials were privileged under Michigan law and Petitioner failed to make the necessary showing to overcome the privilege. (Plaintiff's Response to Defendant's Mot. for Discovery, 1, docket #13.) The trial court ruled that in addition to the fact that the prosecutor did not intend to use medical examination results, the defense failed to argue that anything related to a medical examination could be exculpatory in this case. (DH Tr. I, 20.) The trial court also denied Petitioner's motion for medical records from the victim's counseling sessions without prejudice. (DH Tr. I, 22.) Petitioner contends that medical records could have shown that the victim's hymen was intact, and thus, that penetration had not occurred. He further argues that medical records would have shown that the

victim was taking Vicodin or other drugs at the time of the alleged sexual assaults and that she had received counseling for drug use.

In response to Petitioner's request for any records pertaining to previous incidents or allegations of assault by the accused against Petitioner or any other person, the prosecutor stated that court records are generally as available to the defense as they are to the prosecution, although the prosecutor was not aware of any such information. The prosecutor further noted that protective services reports of abuse or neglect are subject to in camera review only when a showing has been made and that Petitioner had not made such a showing. (Plaintiff's Response to Defendant's Mot. for Discovery, 3, docket #13.) The trial court denied Petitioner's request because that the prosecutor was not obligated to seek out such information. (DH Tr. I, 13, 22.)

At a subsequent hearing, the defense renewed its motion for disclosure of Clinton Country Friend of the Court records from ten or eleven years earlier showing attempts by the victim's mother to limit or restrict visitation because of alleged misconduct by Petitioner. Defense counsel argued that the records would establish the mother's bias against Petitioner and motive to fabricate. (DH Tr. II, 18-19.) The trial court agreed that regardless of whether the mother testified, the defense was entitled to suggest that the victim's mother encouraged her to make false accusations against Petitioner. Accordingly, the Court conducted an in camera inspection of the Clinton County Friend of the Court records to determine whether they contained evidence relevant to the defense. (DH Tr. II, 23-24.) After conducting the review, the trial court determined that the mother's complaints to the Friend of the Court, which were not allegations of sexual assault, were not relevant evidence. However, Petitioner maintains that the prosecutor did not submit the full Friend of the Court file to the trial court for review. According to Petitioner, the victim's mother

made at least eight complaints to the Friend of the Court and that three of those complaints were sexual in nature.

Analyzing the claim under state law, the Michigan Court of Appeals found that the trial court did not abuse its discretion in denying Plaintiff's discovery requests. The court stated in part:

> With regard to defendant's request for police notes, the court properly conducted an in camera review of the notes and provided defendant with copies of the notes the court found discoverable. *People v Stanaway*, 446 Mich 643, 649-650; 521 NW2d 557 (1994). This Court finds there was no abuse of discretion in conducting the in camera review because defendant does not allege the court abused its discretion, the notes were relevant to the content and direction of the taped conversation between the complainant and defendant, and the court properly reviewed the notes and provided copies to both parties.

> With regard to defendant's request for the medical reports resulting from the medical examination conducted on the victim, the prosecutor never used any findings, or lack thereof, obtained during the medical examination. Pursuant to MCR 6.201(C)(2), defendant must demonstrate a good-faith belief, grounded in articulable fact, that there is a reasonable probability that records protected by privilege are likely to contain material information necessary to the defense. Neither in the record below nor in his appellate brief does defendant demonstrate any material information that may be in the report. Accordingly, defendant has not put forth a good-faith argument to refute the privilege, and therefore, no in camera review of the medical reports was necessary.

> With regard to defendant's request for all records generated as a result of prior incidents or claims made by the complainant related to sexual activity or assaultive contact, either against the accused or any other person, the prosecutor has maintained that he has provided defendant with a copy of the complete report made available to him. Therefore, defendant has the same information as the prosecutor with regard to the police reports and any previous claims. Additionally, false claims would constitute exculpatory evidence, and the prosecutor is required to provide such information to defendant upon request. MCR 6.201(B)(1). The prosecutor has stated that he is not aware of any prior false claims, and therefore, he is unaware of any records with which to provide defendant. Defendant does not argue that the prosecutor is being untruthful, or that such records do exist. Accordingly, the court did not abuse its discretion in denying defendant's request for said records.

***

- 21 -

Next, defendant requested discovery of the records, notes and reports kept by any doctor, social worker, psychologist, advocate, or other care provider who examined or interviewed the complaining witness that would be used by the state. Defendant's request was specifically limited to information that would be used by the state, and the prosecutor maintained that he never intended to introduce any such records at trial and did not do so. Accordingly, the court did not abuse its discretion in denying defendant's request.

(MCOA Op. 2-3.)

To the extent Petitioner contends that the prosecutor violated state discovery rules, his claim is not cognizable for purposes of federal habeas corpus review. *See Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002). Petitioner also is unable to establish a violation of his federal due process rights. Under *Brady v. Maryland*, 373 U.S. 83 (1963), "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Supreme Court has held that "[t]here are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice (and materiality) is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 281 (quoting *Bagley*, 473 U.S. at 682); *see also Cone v. Bell*, 129 S. Ct. 1769, 1783 (2009). A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

Officer Benn's notes from the phone conversation between Allison and Petitioner were not exculpatory in the sense that they demonstrated Petitioner's innocence. At most, defense

- 22 -

counsel attempted to use the notes to impeach the credibility of the victim and the investigating officer. Assuming the notes were favorable to the accused, Petitioner cannot show that Benn's notes were suppressed because the prosecutor turned them over to the trial court for in-camera review. Furthermore, Benn's notes from the phone conversation were provided to the defense at trial and admitted as evidence. *Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose. *See U.S. v. Bencs*, 28 F. 3d 555, 560-61 (6th Cir. 1994). While the notes were not provided to the defense until after the trial commenced, they consisted only of one to two pages and defense counsel did not request additional time to review them. Moreover, Petitioner cannot show prejudice as the notes were admitted at trial and defense counsel effectively utilized the notes to conduct a thorough cross-examination of Benn regarding the questions asked of Petitioner during the call. Thus, the jury was fully appraised of Benn's strategy in attempting to solicit a confession from Petitioner during the phone conversation. Moreover, Petitioner only speculates that the remaining police notes that were not provided to the defense contained information that would have assisted the defense.

Petitioner's claim concerning medical records is purely speculative. As discussed by the Michigan Court of Appeals, the prosecution did not present medical evidence at trial and there is no evidence that the prosecutor was in possession of any medical records that would have been favorable to the defense. *Brady* does not impose an affirmative duty upon the government to take action to discover information which it does not possess. *Goff v. Bagley*, 601 F.3d 445, 476 (6th Cir. 2010); *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007). Consequently, Petitioner cannot establish that the prosecutor suppressed evidence. Furthermore, Petitioner's mere speculation that the medical records would have been favorable to his defense cannot support a

*Brady* claim.  *See United States v. Mullins*, 22 F.3d 1365, 1373 (6th Cir. 1994).  To the extent Petitioner contends that the medical records would have shown that the victim was taking Vicodin or a similar drug at the time of the offenses in this case, the victim and her mother both testified at trial that Allison was taking Vicodin following surgery.

Petitioner maintains that the victim's mother made numerous complaints against him to the Clinton County Friend of the Court, some of which were sexual in nature, which would have established bias on the part of the victim's mother and a motive to fabricate the present allegations of sexual abuse.  The trial court conducted an in camera review of Clinton County Friend of the Court records produced by the prosecution and concluded that the victim's mother's complaints, none of which asserted sexual abuse by Petitioner, were not relevant to the defense.  While Petitioner contends that the trial court did not review the full Friend of the Court record, Petitioner never has produced evidence that the victim's mother made earlier allegations that Petitioner inappropriately touched or sexually abused the victim.  Petitioner, therefore, cannot show that the prosecutor suppressed evidence that was favorable to the defense.  Moreover, on cross-examination, the victim's mother admitted that she did not like Petitioner and tried to block his visitation rights a number of times when they were first divorced.  (Tr. I, 167.)  Thus, the victim's mother provided testimony from which Petitioner could present his theory of bias and motive to fabricate.

In summary, Petitioner has failed to establish that any of the evidence in question was favorable to his case.  Additionally, Petitioner has failed to establish that he was prejudiced by the failure to turn over evidence, as required by *Brady*.  None of the evidence encompassed by the discovery order, even when considered collectively, suggests that the proceedings would have been different if the evidence had been disclosed earlier.  *See Johnson v. Bell*, 525 F.3d 466, 475 (6th Cir.

2008) (noting the Supreme Court's requirement to consider evidence collectively, and not item by item, to determine whether a *Brady* violation occurred).  Specifically, the record indicates that the trial judge carefully considered Petitioner's discovery requests and made accommodations to avoid any prejudice to Petitioner's defense.  Petitioner, therefore, is not entitled to habeas corpus relief on Grounds II or III.

### Ground IV: Bad Acts Evidence

Petitioner claims that the trial court violated his constitutional rights by allowing the admission of bad acts evidence pursuant to M.C.R. 404(b).  Petitioner specifically complains that the trial court allowed the victim to testify regarding an uncharged incident that allegedly occurred after the charged sexual misconduct in which Petitioner attempted to engage in sexual relations with the victim by touching her breast, but stopped when she said "no."  (Tr. I, 207.)  Petitioner also claims that the trial court improperly admitted the victim's testimony regarding conduct that allegedly occurred before the charged sexual misconduct, including that Petitioner took a digital photograph of the victim while she was topless and holding a dildo, and that Petitioner had given the victim "titty twisters" on at least five or six occasions.  (Tr. I, 210-215.)  Following a hearing, the court allowed the prosecutor to present the evidence.

The Michigan Court of Appeals held that the trial court did not abuse it's discretion by allowing the evidence, stating in pertinent part:

> To be admissible under MRE 404(b), bad acts evidence must satisfy three requirements:  (1) the evidence must be offered for a proper purpose rather than to prove defendant's character or propensity to commit a crime, (2) the evidence must be relevant to an issue or fact of consequence at trial, and (3) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice. *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993); *People v Layher*, 238 Mich App 573, 585; 607 NW2d 91 (1999).

- 25 -

First, the evidence must be offered for a proper purpose rather than to prove defendant's character or propensity to commit a crime. *Layher, supra* at 585. Relative to child sexual abuse cases, the *Layher* court stated:

> "In *People v DerMartzex*, 390 Mich 410; 213 NW2d 97 (1973), the Supreme Court held that evidence of other sexual acts between a defendant and his victim may be admissible if the defendant and the victim live in the same household and if, without such evidence, the victim's testimony would seem incredible." [*Layher, supra* at 585 (citations omitted).]

In the present case, the prosecutor sought to introduce evidence of acts that were sexual in nature. Evidence of defendant's attempt to initiate sexual contact with the complainant by touching her body is consistent with the sexual acts previously initiated by defendant. The photograph defendant allegedly took of the complainant showed her topless and holding a sexual item. Both elements of the photograph sexualized the complainant. Similarly, there was evidence that defendant would grab and twist private areas on the complainant's body. Therefore, the court did not abuse its discretion in finding that evidence of all of these acts showed defendant's improper sexual interest.

It was undisputed that the complainant and defendant lived in the same household during defendant's visitation times with her every other weekend. Additionally, it is likely the complainant's story would have appeared incredible without the evidence of other incidents because the jury would have had difficulty understanding how the two incidents occurred in isolation if there were no prior or subsequent incidents. As noted in *DerMartzex*, limiting a witness's testimony to the specific acts charged and not allowing her to mention acts leading up to the assault undermines the witness's credibility. *DeMartzex, supra* at 414-415. The court noted, "[c]ommon experience indicates that sexual intercourse and attempts thereat are most frequently the culmination of prior acts of sexual intimacy." *Id.* at 415. In this case, the evidence of the photograph and defendant's grabbing of the complainant's nipples showed defendant's prior sexual interest and serves to explain what led up to the two incidents. Similarly, evidence of defendant's subsequent attempts to initiate sexual intimacy with the victim explained why the abuse stopped.

Additionally, defendant admits the prosecutor's case relied heavily on the victim's credibility. The defense theory at trial was that the complainant fabricated these charges because she was mad at her father, and her testimony regarding the incidents was inconsistent and generally not credible. Defendant attempted to diminish her credibility by portraying her as an untruthful witness with a motive to fabricate her story. The Michigan Supreme Court has held that prior sexual acts between a defendant and his alleged victim are admissible to rebut the defendant's claim that the charges were groundless or fabricated. *See People v Starr*, 457 Mich 490, 501-502; 577 NW2d 673 (1998). Accordingly, the court did not abuse its

discretion in finding that, pursuant to the exception found in *DerMartzex*, the evidence was offered for a proper purpose other than to prove defendant's character or propensity to commit a crime.

Next, the evidence must be relevant to an issue or fact of consequence at trial. *Layher, supra* at 585. Defendant was charged with criminal sexual conduct, and therefore, for the reasons discussed above, the court did not abuse its discretion in finding that previous and subsequent sexual conduct between defendant and the complainant would have some tendency to make the occurrence of the sexual acts for which defendant was charged were more or less probable.

Finally, the probative value of the evidence must not substantially outweigh the danger of unfair prejudice. *Layher, supra* at 585. However, *DerMartzex* and its progeny have continually noted that previous and subsequent sexual acts between a defendant and the alleged victim are highly probative and outweigh the danger of unfair prejudice because they bolster the complainant's credibility and explain the progression of events that led to the incidents with which the defendant was eventually charged. *DerMartzex, supra* at 413-415; *People v Wright*, 161 Mich App 682, 687-688; 411 NW2d 826 (1987).

Accordingly, pursuant to *DerMartzex*, the trial court did not abuse its discretion in admitting the other acts evidence at issue.

(MCOA Op., 7-8.)

To the extent Petitioner claims that the evidence was admitted in violation of M.R.E. 404(b), he fails to raise a cognizable federal claim. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and

conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Petitioner cannot establish that the trial court's admission of the bad acts evidence rendered his trial fundamentally unfair.  As discussed by the Michigan Court of Appeals, the evidence was relevant to show Petitioner's sexual interest in the victim both before and after the charged sexual misconduct.  Moreover, the Sixth Circuit has held in *Bugh* that the state court's admission of bad acts evidence concerning uncharged acts of child molestation was not contrary to clearly established Supreme Court precedent, inasmuch as " [t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512.  As a result, "there is no Supreme Court precedent that the trial court's decision could be deemed 'contrary to,' under AEDPA."  *Id; see also Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007); *Hirsch v. Brigano*, 74 F. App'x 486, 489 (6th Cir. 2003).  Petitioner, therefore, is not entitled to habeas corpus relief under the AEDPA.

### Ground V: *Blakely* Violation

Petitioner argues that the trial court violated his Sixth Amendment right to a trial by jury by using, to enhance his sentence, facts that had not been admitted by Petitioner or found by a jury beyond a reasonable doubt.  Specifically, Petitioner asserts that the trial court improperly considered the conduct alleged in the two counts for which he was acquitted in calculating the sentencing guidelines.  Petitioner argument is based on the United States Supreme Court holding in *Blakely v. Washington*, 542 U.S. 296 (2004).  The Michigan Court of appeals correctly rejected Petitioner's claim because *Blakely* does not apply to the Michigan setencing guidelines.  *Blakely* concerned the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury but by the judge.  Applying the Washington mandatory sentencing guidelines, the trial judge found facts that increased the maximum sentence faced by the defendant.  The Supreme Court found that this scheme offended the Sixth Amendment, because any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt.  *Blakely,* 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term.  The maximum sentence is not determined by the trial judge, but is set by law. *See People v. Drohan,* 715 N.W.2d 778, 789-91 (Mich. 2006) (citing Mich. Comp. Laws § 769.8).  Only the minimum sentence is based on the applicable sentencing guideline range. *Id.*; *and see People v. Babcock*, 666 N.W.2d 231, 236 n.7 (Mich. 2003) (citing Mich. Comp. Laws

§ 769.34(2)).  The Sixth Circuit authoritatively has held that the Michigan indeterminate sentencing system does not run afoul of *Blakely*.  *See Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009) (affirming district court's dismissal of prisoner's claim under *Blakely v. Washington* because it does not apply to Michigan's indeterminate sentencing scheme); *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007).

To the extent Petitioner argues that the trial court improperly scored the sentencing guidelines, there is no constitutional right to individualized sentencing in non-capital cases. *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991); *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995); *see also Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (in a case holding that mitigating factors must be fully considered in death penalty cases, the Court "recognize[d] that, in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes.").  Since Petitioner has no federal right to an individualized sentence, this ground presents an issue of state law only. Petitioner has not alleged grounds for the Court to conclude that this is one of those rare instances where an alleged state-law sentencing error was so egregious that it led to a fundamentally unfair outcome. *See Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. 2005) (citing *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003)).  Therefore, the state court's determination of Petitioner's claim was not contrary to federal law clearly established by the United States Supreme Court or an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

### Ground VI:  Bias and Abuse of Discretion by the Trial Court[1]

In his sixth ground for habeas corpus relief, Petitioner claims that his constitutional rights were violated "as a result of prejudice, bias, and abuse of discretion displayed by the court, as the result of a single act, or the culmination of numerous acts."  (Pet., Page ID#29.)  In support of his claim, Petitioner cites the trial court's denial of his pre-trial discovery motions (Ground II), the denial of his discovery motion with regard to Officer Benn's notes (Ground III), the trial court's denial of Petitioner's motion for a directed verdict (Ground VIII), the trial court's denial of his motion for a new trial based upon the bailiff's comment to the jury (Ground I) and errors in the PSIR (Ground XI).  In addition, Petitioner contends that the nature of the trial court "advocate[d] for the prosecution" when he asked questions of the victim during cross-examination.  Finally, Petitioner contends that the judge could not be impartial because he went to the same church as the victim's mother.

An impartial judge is a necessary component of a fair trial.  *In re Murchison*, 349 U.S. 133, 136 (1955); *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). The Supreme Court explained, "[i]t is obvious that under any system of jury trials the influence of the trial judge on the jury is

---

[1]Respondent contends that Grounds VI through XI are procedurally defaulted.  Petitioner raised Grounds VI through XI for the first time in his motion for relief from judgment.  As set forth above, the circuit court denied his motion on the merits.  (Opinion and Order Denying Defendant's Motion for Relief from Judgment, docket #18.) The Michigan Court of Appeals also denied Petitioner's application for leave to appeal for lack of merit in the grounds presented.  (*See* Mich. Ct. App. Ord., docket #21.)  The Michigan Supreme Court subsequently denied Petitioner's application for leave to appeal for failure to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D) (*See* Mich. Ord., docket #23). Respondent contends that Grounds VI through XI are procedurally defaulted as a result of the Michigan Supreme Court's reliance on M.C.R. 6.508(D).  However, the Sixth Circuit, sitting *en banc*, recently decided in *Guilmette v. Howes*, 624 F.3d 286 (6th Cir. 2010), that brief form orders by the Michigan appellate courts invoking MICH. CT. R. 6.508(D) are unexplained orders within the meaning of *Ylst v. Nunnemaker*, 501 U.S. 797 (1991).  Such form orders are presumed to uphold or reject the last reasoned decision below.  *Guilmette*, 624 F.3d at 291-92 (citing *Ylst*, 501 U.S. at 803).  As a result, absent an explained decision from some Michigan court applying Rule 6.508(D), the federal court may not invoke procedural default to dispose of a habeas claim that has been rejected by the Michigan courts on the grounds of MCR 6.508(D).  Because the state circuit court issued the last reasoned decision on the merits of Petitioner's motion for relief from judgment, Grounds VI through IX are not procedurally defaulted.

necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." *Carter v. Kentucky*, 450 U.S. 288, 302 (1981) (*quoting Starr v. United States*, 153 U.S. 614, 626 (1894)).  Supreme Court decisions addressing claims of a denial of due process because of a trial judge's bias follow two lines of reasoning.  One group of cases addresses charges of "judicial bias" stemming from a trial judge's "personal interest," or "stake," in the outcome of a case, usually derived from some extrajudicial association with the cause or with one of the parties.  *See In re Murchison*, 349 U.S. 133, 136 (1955); *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). The second group of cases is more appropriately described as the "judicial misconduct" cases.  *See Liteky v. United States*, 510 U.S. 540, 555-56 (1994).  This second group consists, for the most part, of cases in which the trial judge is accused of conducting the proceedings in a manner that strongly suggests to the jury that the judge disbelieves the defendant's case, or for other reasons, thinks the prosecution should prevail.

Petitioner contends that the trial court turned into an "advocate for the prosecution" when he asked questions of the victim during cross-examination.  On cross-examination, defense counsel attempted to establish that the victim changed her story about who and when she first told about the alleged sexual abuse in order to undercut the defense theory that she made up the allegations against Petitioner because she was angry at him for punishing her for crashing his cars.  In response to the prosecutor's objections and the witness' apparent confusion over defense counsel's questions, the trial court clarified matters through the following exchange:

The Court:      – let me find out from my notes because I'm a little confused, and that doesn't mean much, except I'm getting old.

I understood that you testified today that the first person you told was Dylan Billips, is that right?

The Witness:   Yes.

The Court:       And I understood you falsely testified at the preliminary examination in August of 2003, that the first person you told was Lisa Hoffman?

The Witness:  Yes, that is correct.

The Court:       And I understood you testified at the preliminary hearing in August 2003 that you first told anybody about this in the spring of 2003?

The Witness:  Yes.

The Court:       Okay.  When did you, based on your testimony today, first tell anybody about this?

The Witness:  Um.

The Court:       Before the Lebaron was cracked up on the summer of 2003?

The Witness:  I believe so.

The Court:       I'll let – I'll let counsel explore it, go ahead.

(Tr I, 249-250.)  Thereafter, defense counsel continued this line of cross-examination at length.  (*See* Tr I, 250-254.)  Later in his cross-examination, defense counsel attempted to establish that the victim lied when she told Trooper Noble that Petitioner sexually assaulted her two times, when she claimed at trial that he assaulted her three times.  The following exchange occurred between the prosecutor, defense counsel and the court:

Prosecutor:      Objection, Judge.  Again, that's misleading, that's not what she said. She said there's two incidents of intercourse and there was one attempt that she shut down, so to suggest and to argue that this is now lying, I think, is misleading and I don't think the witness can respond to that.

Defense Counsel:      Does the Court wish to respond?

The Court:       No.  But let's find out if the claim is that the third incident that was rebuffed involved some sexual touching or contact, because I had thought that was the testimony, but I may be mistaken.

- 33 -

| | |
|---|---|
| Defense Counsel: | My recollection was that I asked that preliminary question on my cross and that she said, yes, there was some sexual touching on this alleged third occasion. |
| The Court: | Well, we can't [sic] find out.  Let me ask you now, did your dad touch you sexually on [a] third occasion when you told him to knock it off? |
| The Witness: | Yes, he started to. |
| The Court: | Tell me what that means?  Tell me what it means when you say he started to? |
| The Witness: | He started to touch my breasts over my shirt and I told to – I told him no. |
| The Court: | Knock it off.  He was touching your breasts, but his hands were on top of your shirt? |
| The Witness: | Right. |
| The Court: | Okay.  I understand what you mean.  Let me let counsel explore it as he wishes. |

(Tr. I, 261-62.)  In both of the instances cited above, it was entirely appropriate for the trial court to intercede and ask questions of the witness in order to clarify her testimony for the jury.  This is especially true when counsel's questions are confusing or misleading.  A trial judge "remains under a duty to conduct the trial in an orderly fashion, to insure that the issues are not obscured and to act at all times with a view toward eliciting the truth."  *United States v. Tilton*, 714 F.2d 642, 644 (6th Cir. 1983).  Moreover, in both instances, the trial court allowed defense counsel to continue his line of questioning after making the clarification.  There was nothing improper about the trial court's tone or questions.

Petitioner also asserts that the judge could not be impartial because he went to the same church as the victim's mother.  In its opinion and order denying Plaintiff's motion for relief

from judgment, the trial court rejected Plaintiff's charge that the court was biased because he attended the same church as the victim's mother, stating:

> Mr. Rademacher claims this Court was in some was biased by the fact that it attended a 300 member church where the victim's mother and defendant also attended.  The Court addressed this issue in a letter dated January 20, 2004 stating this Court could not recall either the victim's mother or her parents and "if either party would like the Court to disqualify itself, the Court would be happy to enter a corresponding order".  This request was never made by either party and is considered moot.

(Op. and Ord. Denying Relief from Judgment, docket #18.)  Thus, the trial court could not recall having seen, let alone having made the acquaintance of, the victim's mother through his church membership.  The mere fact of the trial court's membership in the same church as the victim's mother clearly fails to establish bias.  Furthermore, Petitioner did not ask the trial court to disqualify itself when given the opportunity.

Petitioner also cites various unfavorable rulings by the trial court as evidence of bias. Those rulings are presented as independent claims for habeas corpus relief.  Unfavorable judicial rulings almost never constitute judicial bias. *Liteky v. United States*, 510 U.S. 540, 555 (1994). Moreover, I have reviewed all of the rulings cited by Petitioner and found his claims to be without merit.  I further note that the trial judge did not display an abruptness or hostility toward defense counsel.  In fact, the Court was equally pleasant and collegial toward the prosecutor and defense counsel throughout the proceedings.

Petitioner's claim of cumulative error is not cognizable.  Under the AEDPA, a court only may grant habeas relief based on a misapplication of Supreme Court law.  *Bailey*, 271 F.3d at 655.  The Sixth Circuit repeatedly has stated that cumulative error claims are not cognizable on habeas review.  "The Supreme Court has not held that constitutional claims that would not

individually support habeas relief may be cumulated in order to support relief." *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004); *Millender v. Adams,* 376 F.3d 520, 529 (6th Cir. 2004); *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002). Finally, because I concluded above that the individual claims are without merit, Petitioner cannot show that the cumulative error of the trial court violated his constitutional rights. *See Seymour*, 224 F.3d at 557.

### Ground VII:  Prosecutorial Misconduct

Petitioner contends that the prosecutor engaged in numerous acts of prosecutorial misconduct.  In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13;  *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

A.      Withheld exculpatory evidence

Petitioner first alleges that the prosecutor withheld exculpatory evidence, including medical reports, police office notes and Friend of the Court records.  The Court concluded above with regard to Grounds II and III that no *Brady* violations occurred with regard to medical reports, police office notes or Friend of the Court records.  Accordingly, Petitioner's claim that the prosecutor withheld exculpatory evidence is without merit.

B.      Vindictive prosecution

Petitioner claims that the prosecutor engaged in "vindictive prosecution" when he charged Petitioner with four counts of CSC rather than two counts.  Petitioner maintains that Counts II, III and IV should have been charged as one count because they occurred at the same time and place.  Because the jury convicted him on two counts and acquitted him on the other two counts, Petitioner maintains that the outcome of the case may have been different if he had only been charged with two counts.

For an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his protected statutory or constitutional rights is "'patently unconstitutional.'" *United States v. Goodwin*, 457 U.S. 368, 372 n. 4 (1982) (*quoting Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)) (internal quotations omitted); *United States v. Anderson*, 923 F.2d 450, 453 (6th Cir. 1991) ("A prosecutor vindictively prosecutes a person when he or she acts to deter the exercise of a protected right by the person prosecuted.") (citing *United States v. Andrews*, 633 F.2d 449, 453-55 (6th Cir. 1980)).  Thus, a criminal prosecution which would not have been initiated but for vindictiveness is constitutionally prohibited.  *United States v. Adams*, 870 F.2d 1140, 1145 (6th Cir. 1989) (*quoting Blackledge v. Perry*, 417 U.S. 21, 27-28 (1974)).  "The broad discretion accorded

- 37 -

prosecutors in deciding whom to prosecute is not 'unfettered,' and a decision to prosecute may not be deliberately based upon the exercise of protected statutory rights." *Adams*, 870 F.2d at 1145 (citations omitted); *United States v. Andrews*, 633 F.2d 449, 453 (6th Cir. 1980) (en banc) (stating that a court must reconcile the rule that a prosecutor has broad discretion to file charges where there is probable cause with the rule that vindictive conduct by prosecutors is unacceptable and requires control).

In this case, Petitioner cannot sustain a claim for vindictive prosecution because he does not contend that the prosecutor charged him based upon the exercise of protected statutory rights. Petitioner claims only that the prosecutor should have charged him with fewer counts. Moreover, the charges against Petitioner were consistent with Michigan law. The victim testified that the second sexual encounter with Petitioner involved three penetrations. The victim testified that Petitioner penetrated her vagina with his finger, tongue and then his penis. (Tr I, 203-205.) Under Michigan law, a defendant may be charged with multiple counts of first-degree CSC where multiple penetrations occurred. *See People v. Rogers*, 368 N.W.2d 900, 902 (Mich. Ct. App.1985). Petitioner, therefore, cannot sustain a claim for vindictive prosecution.

C.     Suborned perjury

Petitioner alleges that the prosecutor coached the complaining witness to lie and change her testimony between the preliminary examination and trial in an effort to undercut the defense theory of the case. On cross-examination at trail, the victim testified that she had reviewed her preliminary examination testimony, spoken with the prosecutor two to four times and rehearsed her testimony with the prosecutor in advance of trial. (Tr. I, 256-57.) Defense counsel then examined the victim regarding the change in her story about who she first told about the sexual

abuse.  At the preliminary examination, the victim testified that she first told her friend Lisa

Halfman about the sexual abuse.  At trial, however, the victim testified that she told her ex-boyfriend

Dylan Billups about the sexual assault before she told Halfman.  The following exchange between

defense counsel and the victim ensued:

> Q:   It became apparent to you at the preliminary examination that our position
> was, your dad's and mine, that our position was after you wrecked the car the
> second time, you got mad at your dad and decided to make up a story, you
> realized after August of 2003, right?
>
> A:   I realized that is what you guys were doing?
>
> Q:   Yes?  You came to believe that that's how we were approaching the case,
> right?
>
> A:   I guess.
>
> Q:   Okay.  And you knew that it would help you if you claimed that you told
> your story to somebody before the car wrecks, right, you figured that would
> help your story, right?
>
> A:   But I did, I -- I don't understand how it would help me if I -- I yes.
>
> Q:   And so that's why you changed that, and so you made up some facts to help
> your story be more saleable to the jury, isn't that true?
>
> A:   Those facts are not made up.
>
> Q:   So your testimony is today you're telling the truth, back in August you lied
> under oath?
>
> A:   Yes.

(Tr. I, 258.)

In order to establish a claim of prosecutorial misconduct, the defendant must show

that the statement in question was false, that the prosecution knew it was false, and that it was

material.  *See United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989); *United States v.*

*O'Dell*, 805 F.2d 637, 641 (6th Cir. 1986). Petitioner has failed to establish that the victim's trial testimony that she first told Billups about the sexual abuse by Petitioner was false. Petitioner also has failed to provide any evidence whatsoever that the prosecutor coached the witness to change her story or lie about to whom and when she first reported the sexual assault. The victim testified at trial that she lied at the preliminary examination because she did not want to get Billups involved. (Tr. I, 221.) Moreover, the jury heard the victim's testimony, including her admission that she lied at the preliminary examination, and could judge her credibility accordingly. Consequently, Petitioner's claim is without merit.

        D.     <u>Withheld and minimized information regarding jury tampering</u>

Fourth, Petitioner contends that the prosecutor withheld information regarding jury tampering when he delayed a week after he learned of the bailiff's comment to the jury before notifying the trial court and defense. Petitioner alleges that the prosecutor contacted jurors without notifying the court or the defense and, when he did notify the court, manipulated the bailiff's comment to make it sound less prejudicial. Petitioner's claim warrants little discussion. The prosecutor first received notice of the bailiff's comment approximately a month after the trial concluded. It was entirely reasonable for the prosecutor to conduct a brief investigation before notifying the trial court and defense counsel about the allegations. As discussed with regard to Ground I above, the trial court conducted post-verdict voir dire of the jury and heard testimony from the bailiff who made the comment. In light of the thorough examination conducted by the trial court, Petitioner cannot show that he was denied a fair trial or prejudiced in any way by the prosecutor's brief delay in reporting the bailiff's comment.

        E.     <u>Cumulative error</u>

To the extent Petitioner contends that he is entitled to habeas corpus relief as result of cumulative effect of the prosecutor's alleged misconduct, his claim must fail.  As previously discussed in Ground VI, cumulative error claims are not cognizable on habeas review.  *Scott*, 302 F.3d at 607.  Finally, because I concluded above that the individual claims are without merit, Petitioner cannot show that the cumulative error violated his constitutional rights.  *See Seymour*, 224 F.3d at 557.

### Ground VIII:   Trial Court's Denial of Petitioner's Motion for a Directed Verdict

In his eighth ground for relief, Petitioner claims that the trial court violated his constitutional rights when it denied his motion for a directed verdict and allowed "perjured" testimony to stand as evidence.  Petitioner specifically contends that a directed verdict was appropriate after the victim admitted on direct and cross-examination that she lied under oath at the preliminary examination concerning who she told first about the alleged sexual abuse.  Petitioner further claims that the victim lied about the number of alleged incidents of sexual misconduct.  In denying Petitioner's motion for a directed verdict, the trial court stated:

> [I]f the jury accepts as credible the testimony of Ms. Rademacher, Allison Rademacher, they could on the basis of that testimony find each of the required elements for each of the four charges.  Whether they chose to do that, of course, is the reason we have a jury here, since only they can make the assessment regarding credibility.

(Tr. II, 450.)

A state court's alleged misapplication of state law in failing to grant a petitioner's motion for a directed verdict is not cognizable in a federal habeas corpus proceeding.  *King v. Trippett*, 27 F. App'x 506, 510 (6th Cir. 2001) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)).  Moreover, I concluded in Ground VII above that there is no evidence that the victim's trial

testimony was false.  As the trial court discussed in denying Petitioner's motion for directed verdict, the victim's admission that she lied at the preliminary examination and any inconsistencies in her story were a matter of credibility for the jury to assess.  I also find in Ground IX below that there was sufficient evidence to sustain Petitioner's conviction.  Petitioner, therefore, fails to present a meritorious federal claim.

### Ground IX:  Sufficiency of the Evidence

Petitioner contends in Ground IX that the jury could not have found him guilty beyond a reasonable doubt based upon the victim's "highly questionable" testimony.  Petitioner further argues that the split verdict shows that the jurors had reasonable doubt about his guilt on all of the charges.  According to Petitioner, "[t]he jurors could not have decided that they accepted one part of the accuser's testimony as truth, and the rest of her testimony as false without the existence of doubt." (Pet, Page ID#37.)  Petitioner's claim was rejected by the trial court, which concluded that Petitioner "was found guilty beyond a reasonable doubt, by a jury, weighing all of the evidence presented at trial."  (Opinion and Order Denying Defendant's Motion for Relief from Judgment, docket #23.)

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*,

506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

Under MICH. COMP. LAWS § 750.520b(b), a person is guilty of criminal sexual conduct in the first degree if he engages in sexual penetration[2] with another person that is at least 13 but less than 16 years of age and any of the following circumstances exist:  (i) the actor is a member of the same household as the victim, (ii) the actor is related to the victim by blood or affinity to the fourth degree or (iii) the actor is in a position of authority over the victim and used this authority to coerce the victim to submit. Petitioner does not contend that, if believed, the victim's testimony was insufficient to support Petitioner's conviction for two counts of first-degree criminal sexual conduct. Rather, like Ground VIII, Petitioner's insufficient-evidence argument rests on an allegation involving witness credibility, which is clearly the province of the jury and not this Court. *See Tyler v. Mitchell*, 416 F.3d 500, 505 (6th Cir. 2005) (holding that claim of insufficiency of evidence that rested on attack on witness credibility was clearly within the province of the jury and not matter of legal sufficiency for court on habeas review); *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002) (noting that attacks on witness credibility constitute a challenge to the quality, but not the sufficiency, of the government's evidence). Moreover, Petitioner's assertion the jury had to accept or reject the victim's testimony is without merit. The jury could have found the victim's testimony credible with regard two of the alleged instances of sexual misconduct, but entertained

---

[2]"Sexual penetration" is statutorily defined to mean sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required. MICH. COMP. LAWS § 750.520a(r).

doubts with regard to the other alleged instances.  Accordingly, the decision of the trial court was not an unreasonable application of *Jackson*.

### Ground X:  Ineffective Assistance of Appellate Counsel

In Ground X, Petitioner claims that his appellate counsel was ineffective for failing to raise on direct appeal the six claims included in his motion for relief from judgment.  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Moreover, as the Supreme Court recently has observed, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is

- 44 -

"doubly" deferential.  *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009)); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*

In denying Petitioner's motion for relief from judgment, the trial court found that Petitioner failed to overcome the presumption that counsel's performance was within the wide range of professionally competent assistance.  An appellant has no constitutional right to have every non-frivolous issue raised on appeal.  "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).  To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions."  *Strickland*, 466 U.S. at 688.  As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another.  *Smith v. Robbins*, 528 U.S. 259, 289 (2000).  In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present."  *Id.* at 289.  I find that the issues presented in Petitioner's motion for relief from judgment, which now are presented in this habeas petition, are without merit.  Consequently, the decision of the state court was not an unreasonable application of *Strickland*.

### Ground XI:  Errors in the Pre-Sentence Investigation Report and Judgment of Sentence

In Ground XI, Petitioner claims that the description of the crime and surrounding events contained in the PSIR are "fictionalized" and exaggerated."  He further claims that the Judgment of Sentence issued by the trial court erroneously shows that Counts 2 and 3 were "dismissed," rather than reflecting that he was found not guilty by the jury.  Petitioner does not allege that the alleged false information or errors affected his sentence in this case.  Rather, he claims that the information could affect decisions made by the Michigan Department of Correction (MDOC) and the Michigan Parole Board regarding his placement and parole.

A court violates due process when it imposes a sentence based upon materially false information.  *Townsend v. Burke*, 334 U.S. 736, 740 (1948) (citation omitted).  Petitioner has the burden of demonstrating "first, that the information before the sentencing court was false, and, second, that the court relied on the false information in passing sentence."  *United States v. Stevens*, 851 F.2d 140, 143 (6th Cir. 1988) (citations omitted).

In this case, Petitioner generally asserts that the PSIR contains a "fictionalized" and "exaggerated" allegations concerning the crime, but does not specifically identify the false allegations or demonstrate that they were, in fact, false.  While Petitioner maintains that the challenged allegations did not appear in any "record or transcript," a PSIR includes information from many sources, including police reports, testimony from judicial proceedings, and statements from the victim.  With regard to the judgment of sentence, Petitioner cannot demonstrate that the difference between "dismissed" and "not guilty" is anything more than semantics.  Morever, Petitioner does not assert that the alleged inaccurate information impacted his sentence.  Rather, Petitioner contends that the information could impact his program placement and security level within the MDOC and his parole eligibility.  Habeas relief is limited to claims concerning the fact

or duration of confinement.  *See Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004).  Thus, Plaintiff's allegations concerning his conditions of confinement are not cognizable in habeas corpus proceedings.

To the extent Petitioner contends that the information contained in his PSIR and the judgment of sentence will impact his eligibility for parole, there is no constitutional or inherent right to be conditionally released before the expiration of a prison sentence.  *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979).  Although a state may establish a parole system, it has no duty to do so; thus, the presence of a parole system by itself does not give rise to a constitutionally protected liberty interest in parole release.  *Id.* at 7, 11; *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  Rather, a liberty interest is present only if state law entitles an inmate to release on parole.  *Inmates of Orient Corr. Inst. v. Ohio State Adult Parole Auth.*, 929 F.2d 233, 235 (6th Cir. 1991).  In *Sweeton v. Brown*, 27 F.3d 1162, 1164-165 (6th Cir. 1994) (en banc), the Sixth Circuit, noting "the broad powers of the Michigan authorities to deny parole," held that the Michigan system does not create a liberty interest in parole.  Accordingly, Petitioner fails to raise a claim of constitutional magnitude.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Date:  August 11, 2011                    /s/ Ellen S. Carmody
                                          ELLEN S. CARMODY
                                          United States Magistrate Judge


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).